UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| KENNETH MADSEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:20 CV 1449 ACL |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Plaintiff Kenneth Madsen brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of the Social Security Administration Commissioner's denial of his applications

for child's Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and

Supplemental Security Income ("SSI") under Title XVI of the Act.

An Administrative Law Judge ("ALJ") found that, despite Madsen's severe impairments,

he was not disabled as he had the residual functional capacity ("RFC") to perform work existing

in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with

consent of the parties, pursuant to 28 U.S.C. § 636(c).   A summary of the entire record is

presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be affirmed.

### I.  Procedural History

Madsen filed his application for benefits on May 8, 2018.   (Tr. 178-85.)   He claimed he

became unable to work on March 15, 2018, due to post-traumatic stress disorder ("PTSD"),
anxiety, sleeping disorder, depression, and difficulty eating.   (Tr. 197.)   Madsen was 18 years
of age at his alleged onset of disability date.   His applications were denied initially.   (Tr. 104-
05.)   Madsen's claims were denied by an ALJ on October 30, 2019.   (Tr. 31-43.)   On July 21,
2020, the Appeals Council denied Madsen's claim for review.   (Tr. 1-4.)   Thus, the decision of
the ALJ stands as the final decision of the Commissioner.   *See* 20 C.F.R. §§ 404.981, 416.1481.

In this action, Madsen first argues that "the RFC is not supported by substantial
evidence."   (Doc. 30 at 3.)   Madsen next argues that "the ALJ erred by failing to provide
specific rationale for rejecting Plaintiff's testimony."   *Id.* at 7.

## II.   The ALJ's Determination

The ALJ first found that Madsen had not attained age 22 as of March 15, 2018, his
alleged onset date.   (Tr. 34.)   He stated that Madsen has not engaged in substantial gainful
activity since his alleged onset date.   *Id.*   In addition, the ALJ concluded that Madsen had the
following severe impairments: PTSD, major depressive disorder, generalized anxiety disorder,
panic disorder, and obsessive-compulsive disorder.   *Id.*   The ALJ found that Madsen did not
have an impairment or combination of impairments that met or medically equaled the severity of
one of the listed impairments.   (Tr. 35.)

As to Madsen's RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform a full range of work at all exertional levels but with the
> following nonexertional limitations: he is limited to work that
> involves only simple, routine and repetitive tasks in a low stress
> job defined as making only occasional simple-work related
> decisions and few, if any, work place changes or changes in
> routine and no paced production work, such as assembly line type

jobs.   Contact with the public must be only incidental to work
performed.   He must have only casual and infrequent contact with
coworkers with no tandem tasks and only occasional supervision.

(Tr. 36.)

The ALJ found that Madsen has no past relevant work, but was capable of performing

work existing in substantial numbers in the national economy.   (Tr. 42.)   The ALJ therefore

concluded that Madsen was not under a disability, as defined in the Social Security Act, from

March 15, 2018, through the date of the decision.   (Tr. 43.)

The ALJ's final decision reads as follows:

Based on the application for child's insurance benefits filed on
May 8, 2018, the claimant was not disabled as defined in section
223(d) of the Social Security Act through the date of this decision.

Based on the application for supplemental security income
protectively filed on April 19, 2018, the claimant is not disabled
under section 1614(a)(3)(A) of the Social Security Act.

*Id.*

## III.   Applicable Law

### III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial

evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389,

401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less

than a preponderance of the evidence, but enough that a reasonable person would find it adequate

to support the conclusion.   *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This

"substantial evidence test," however, is "more than a mere search of the record for evidence

supporting the Commissioner's findings."   *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir.

2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a

whole . . . requires a more scrutinizing analysis."   *Id.* (internal quotation marks and citations

omitted).

>  To determine whether the Commissioner's decision is supported by substantial evidence

on the record as a whole, the Court must review the entire administrative record and consider:

>  1.   The credibility findings made by the ALJ.

>  2.   The plaintiff's vocational factors.

>  3.   The medical evidence from treating and consulting physicians.

>  4.   The plaintiff's subjective complaints relating to exertional and
>       non-exertional activities and impairments.

>  5.   Any corroboration by third parties of the plaintiff's
>       impairments.

>  6.   The testimony of vocational experts when required which is
>       based upon a proper hypothetical question which sets forth the
>       claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal

citations omitted).   The Court must also consider any evidence which fairly detracts from the

Commissioner's decision.   *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050

(8th Cir. 1999).   However, even though two inconsistent conclusions may be drawn from the

evidence, the Commissioner's findings may still be supported by substantial evidence on the

record as a whole.   *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v.

Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).   "[I]f there is substantial evidence on the record as

a whole, we must affirm the administrative decision, even if the record could also have supported

an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal

quotation marks and citation omitted); s*ee also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974,

977 (8th Cir. 2003).   Put another way, a court should "disturb the ALJ's decision only if it falls

outside the available zone of choice." *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015)

(citation omitted).

**III.B.   Determination of Disability**

A disability is defined as the inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or that has lasted or can be expected to last for a continuous period of not less than

twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905.   A claimant

has a disability when the claimant is "not only unable to do his previous work but cannot,

considering his age, education and work experience engage in any kind of substantial gainful

work which exists … in significant numbers in the region where such individual lives or in

several regions of the country."   42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social

Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the

regulations.   20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   First,

the Commissioner will consider a claimant's work activity.   If the claimant is engaged in

substantial gainful activity, then the claimant is not disabled.   20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner

looks to see "whether the claimant has a severe impairment that significantly limits the

claimant's physical or mental ability to perform basic work activities."   *Dixon v. Barnhart*, 343

F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, reaching out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on his ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional

tasks or, in other words, what the claimant can still do despite his or his physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1).   The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources."   20 C.F.R. § 416.945(a)(3).   The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations.   *See id*.   If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled.   *Id*. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his age, education, and work experience.   *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n. 5 (8th Cir. 2000).   The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy.   *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v).   If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled.   If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled.   20 C.F.R. § 416.920(a)(4)(v).   At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant.   *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.   The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.   *See* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1).   If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent."   20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2).   The Commissioner must then rate the degree of functional loss resulting from the impairments.   *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3).   Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.   *See id.*   Next, the Commissioner must determine the severity of the impairment based on those ratings.   *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c).   If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.   *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).   This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.   *See id.*   If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare an RFC assessment.   *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

## IV.   Discussion

Madsen argues that the ALJ erred in determining his mental[1] RFC and in rejecting his testimony regarding his limitations.   The undersigned will discuss these claims in turn, beginning with the ALJ's analysis of Madsen's subjective complaints.

---

[1]Madsen's claims of error relate solely to his mental impairments.   The Court will, therefore,

### 1.  Subjective Complaints

The ALJ summarized Madsen's testimony at the hearing regarding his limitations as follows, in relevant part:

> He has crying spells when his mother gets frustrated.   They last 30 minutes to an hour.   He stays at home and pets his dog or reads Bible verses.   He watches television to get his mind off things.   He likes the news, but does not like shootings and crimes.   He goes with his mom once a week to grocery shop.   He gets very depressed and does not know what he would like to eat.   He has problems remembering.   He does not understand himself sometimes.   He has panic attacks thinking of things that remind him of his father.   He does not get things done.   People make him feel unhappy and cold.

(Tr. 37.)

Part of the RFC determination includes an assessment of a claimant's credibility regarding subjective complaints.   Using the *Polaski* factors, "[s]ubjective complaints may be discounted if there are inconsistencies in the evidence as a whole."   *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *see also Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (noting *Polaski* factors must be considered before discounting subjective complaints).   The *Polaski* factors include (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions.   *Polaski*, 739 F.2d at 1322; *see also* 20 C.F.R. § 416.929(c)(3).

Madsen argues that the ALJ failed to properly discuss his subjective complaints, resulting in an RFC determination not supported by substantial evidence.   He notes that he testified that his severe anxiety prevents him from driving, leaving his house, or doing much of anything on

---

only discuss the medical evidence related to Madsen's mental impairments.

his own; and he has crying spells lasting thirty minutes, panic attacks, memory problems, and concentration issues.

The Court finds that the ALJ adequately considered the *Polaski* factors.   First, he discussed the objective medical evidence and found it was not entirely supportive of Madsen's subjective complaints.

The ALJ noted that Madsen received emergency room treatment in May 2015, at the age of sixteen, following an overdose of his mother's Xanax.   (Tr. 38, 860.)   Madsen reported that he took the pills because he did not want to be "stressed out."   (Tr. 860.)   It was noted that he had a history of PTSD, which was diagnosed at the age of fourteen.   *Id.*   Madsen's speech was slightly slurred, but he was in no distress.   (Tr. 38, 865.)   He argued with the nursing staff when he was told he could not leave immediately.   *Id.*   Madsen was transferred to another hospital the next day.   (Tr. 38, 867.)   The record does not contain documentation from that facility.

Madsen established care at Affinia Healthcare on April 16, 2018, for PTSD and complaints of feeling depressed and anxious, and having difficulty sleeping.   (Tr. 38, 980.)   He was not taking any medications at that time.   (Tr. 38.)   Madsen's mother was present and would not leave the room when the examining physician asked to interview Madsen alone.   *Id.*   Madsen's mother requested anxiety medications.   *Id.*   Madsen's mood and affect were appropriate, and no abnormalities were observed on examination.   (Tr. 982.)   Madsen met with a social worker at Affinia that same day.   (Tr. 977.)   He reported that his father was very abusive to him and had recently passed away.   *Id.*   Madsen lived by himself.   *Id.*   Madsen's mother "appears to be overwhelming, insisting that he needs the meds," and questioning the need for lab work.   *Id.*   They left without doing the lab work, stating "we need our medicine right now."   (Tr. 978.)

On April 19, 2018, Madsen saw psychiatrist Colleen Donovan, M.D., at Affinia.   (Tr. 972.)   Dr. Donovan noted that Madsen had started seeing a psychiatrist at the age of thirteen, in the setting of his parents separating.   (Tr. 974.)   He had experienced suicidal thoughts and attempted to overdose in 2015, due to stress related to having to testify against his father in a custody hearing.   *Id.*   He complained of nightmares related to a history of physical abuse from his father.   *Id.*   Madsen indicated that he avoided social situations, although he attended a church fellowship group weekly.   *Id.*   He was currently working for his mother, although he reported he would like to attend college.   (Tr. 975.)   He used marijuana every other day.   *Id.* Upon mental status examination, Madsen was cooperative, his affect was constricted, his thought process was logical, and his cognition, insight, and judgment were within normal limits.   (Tr. 975-76.)   Dr. Donovan diagnosed Madsen with chronic PTSD.   (Tr. 973.)   She noted that Madsen was "immature" and "overly deferential to his mother."   *Id.*   Dr. Donovan started Madsen on Buspar[2] and Remeron.[3]   *Id.*   Madsen returned for follow-up on May 17, 2018, at which time he reported some improvement in his anxiety.   (Tr. 968.)   He was thinking of going to college at Lindenwood University and was currently studying for the ACT.   *Id.*   On examination, Madsen was anxious, but was not agitated, his mood and affect were appropriate, and his attention was normal.   (Tr. 969.)   Dr. Donovan's assessment was "ongoing anxiety with moderate improvement with Buspar."   (Tr. 970.)   In July 2018, Madsen reported he was "doing good," although he had difficulty focusing while driving.   (Tr. 960.)   He was working for his mother and was thinking of going to Lindenwood in the fall.   *Id.*   Madsen's affect was blunted,

---

[2]Buspar is indicated for the treatment of anxiety.   *See* WebMD, http://www.webmd.com/drugs (last visited January 14, 2022).

[3]Remeron is indicated for the treatment of depression.   *See* WebMD, http://www.webmd.com/drugs (last visited January 14, 2022).

but his examination was otherwise normal.   (Tr. 961.)   Dr. Donovan continued Madsen's medications.   (Tr. 963.)   In December 2018, Madsen complained of stress and anxiety related to his bills; and indicated he frequently made sure all the doors in the house were shut and locked.   (Tr. N951.)   Madsen reported that he was still attending his church group, although he felt somewhat judged there.   *Id.*   Dr. Donovan noted Madsen's eye contact was intense and his speech was stilted, but his examination was otherwise normal.   (Tr. 951.)   She increased his dosage of Buspar.   (Tr. 952.)

The ALJ stated that the medical treatment records do not document ongoing and frequent treatment by a psychiatrist, psychologist, or counselor.   (Tr. 41.)   Instead, Madsen established treatment with a psychiatrist in April 2018, just one month prior to his alleged onset of disability. Madsen received psychiatric treatment only sporadically from that time to the date of the ALJ's decision.   He saw treating psychiatrist Dr. Donovan only four times between April 2018 and the date of the ALJ's decision.   The ALJ further noted that there is no evidence that Madsen was ever refused treatment for financial reasons, nor any evidence that he sought low cost or free treatment options.   Consequently, the ALJ stated that Madsen's lack of financial resources is not a credible reason for his failure to seek consistent treatment.   (Tr. 41.)   The ALJ properly considered Madsen's infrequent treatment in assessing his subjective allegations.   *See Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004) ("Infrequent treatment is also a basis for discounting a claimant's subjective complaints.").

The ALJ next found that the treatment notes do not document any significant abnormalities in areas such as mood, affect, thought processes, concentration, attention, pace, persistence, social interaction, activities of daily living, judgment, insight, or cognitive function. (Tr. 41.)   The records of Madsen's providers at Affinity summarized above support this finding.

In fact, Madsen even states in his Brief that he "agrees with the ALJ's statements about the objective evidence…"   (Doc. 30 at 4.)   Although an ALJ may not disregard a claimant's complaints based solely on objective medical evidence, it is one factor the ALJ may consider. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (citing *Tennant v. Apfel*, 224 F.3d 869, 871 (8th Cir. 2000)).   The ALJ properly considered the lack of objective evidence of abnormalities when assessing Madsen's subjective complaints.

The ALJ pointed out that, although Madsen indicated he experienced side effects from his medications in his Function Report, he did not report any side effects to his physicians.   (Tr. 41, 231.)   The medical records instead indicate that Madsen's medications were effective at controlling his symptoms.   (Tr. 968, 970, 960.)   *See Bernard v. Colvin*, 774 F.3d 482, 488 (8th Cir. 2014) (an impairment that is "controllable or amenable to treatment [does] not support a finding of total disability").

With regard to Madsen's daily activities, the ALJ stated that Madsen lives alone, goes grocery shopping, takes his dog to the park, attends a church group regularly, and worked for his mother during the relevant period.   (Tr. 40, 60, 67, 70.)   Madsen also planned to go to college and studied for the ACT after his alleged onset of disability date, although he ultimately did not complete the test due to failing the Mathematics section.   (Tr. 72-73.)   The ALJ found that Madsen's reported activities were not entirely consistent with his allegations of disability.   (Tr. 42.)   *See Haley v. Massanari,* 258 F.3d 742, 748 (8th Cir. 2001) (Significant daily activities may be inconsistent with claims of disabling pain).

In sum, the ALJ properly considered the *Polaski* factors, including Madsen's failure to seek regular treatment for his mental impairments, the lack of objective findings on examination,

effective use of medication, and significant daily activities, in assessing Madsen's subjective complaints.

## 2. RFC

A claimant's RFC is the most he can do despite his physical or mental limitations. *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).   It is the ALJ's responsibility to determine a claimant's RFC by evaluating all medical and non-medical evidence of record.   20 C.F.R. §§ 404.1545, 404.1546, 416.945, 416.946.   Some medical evidence must support the ALJ's RFC finding, but there is no requirement that the evidence take the form of a specific medical opinion from a claimant's physician.   *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012); *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011).   "The determination of a claimant's RFC during an administrative hearing is the ALJ's sole responsibility and is distinct from a medical source's opinion."   *Wallenbrock v. Saul*, No. 4:20-CV-00182-SRC, 2021 WL 1143908, at *6 (E.D. Mo. Mar. 25, 2021) (citing *Kamann v. Colvin*, 721 F.3d 945, 950-51 (8th Cir. 2013)).   Additionally, when determining a claimant's RFC, the ALJ must evaluate the credibility of the claimant's subjective complaints. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005).

The ALJ determined that Madsen had the mental RFC to perform work at all exertional levels, with the following non-exertional limitations:   work that involves only simple, routine, and repetitive tasks in a low stress job (defined as making only occasional simple work-related decisions and few, if any, work place changes or changes in routine; and no paced production work); contact with the public must be only incidental to work performed; only casual and

infrequent contact with co-workers, with no tandem tasks; and only occasional supervision.   (Tr. 36.)

In addition to the medical evidence discussed above, the ALJ considered the opinion evidence.   Madsen underwent a consultative psychological evaluation performed by Paul W. Rexroat, Ph.D., on August 14, 2018.   He presented with his mother and was nicely dressed and groomed.   (Tr. 837.)   Madsen and his mother described symptoms of major depressive disorder with psychotic features, PTSD, generalized anxiety disorder, and panic disorder.   (Tr. 837-38.)   On examination, Madsen was anxious and tense, but not shaky or tremulous; he exhibited a mildly restricted range of emotional responsiveness and a slightly flat affect; had a normal energy level; was alert and cooperative; his speech was normal, coherent, and relevant, with no evidence of flight of ideas or any other indication of a thought disorder; he exhibited no current suicidal ideation or paranoia; and his intelligence was estimated as in the "low average range." *Id.*   With regard to Madsen's functional limitations, Dr. Rexroat expressed the opinion that Madsen was able to understand and remember simple instructions, has moderate limitations in his abilities to interact socially, and has marked limitations in his ability to adapt to his environment.   (Tr. 838.)

The ALJ found that Dr. Rexroat's opinions were not persuasive, as they are neither supportable nor consistent.   (Tr. 39.)   The ALJ explained that Dr. Rexroat's mental status examination was unremarkable and did not show significant abnormalities in mood, affect, thought process, or cognition.   *Id.*   He also noted that it appears Dr. Rexroat relied upon Madsen's mother's input.   *Id.*   The ALJ further found that Dr. Rexroat's finding of marked limitations were inconsistent with Madsen's ability to live independently, do his own grocery shopping, cook meals, and do his own laundry.   *Id.*

The ALJ next discussed the Medical Source Statement of Dr. Donovan, completed on July 25, 2019.  (Tr. 40, 841-44.)  Dr. Donovan expressed the opinion that Madsen had marked limitations in his ability to initiate and complete tasks in a timely manner, sustain ordinary routine and regular attendance, use reason and judgment to make work-related decisions, understand and learn instructions, regulate emotions, control behavior, maintain well-being in a work setting, and maintain socially acceptable behavior.  *Id.*  She found Madsen had moderate limitations in his ability to ignore or avoid distractions, follow one or two-step oral instructions to carry out a task, function independently, work a full day without needing additional rest periods, distinguish between acceptable and unacceptable work performance, keep social interactions free of excessive irritability or sensitivity, maintain socially acceptable behavior, and respond appropriately to requests, criticism, suggestions, correction, and challenges.  *Id.*  Dr. Donovan indicated that Madsen's pace of production would be 21 to 30 percent below average; he would be late to work due to his symptoms approximately once a month and would miss approximately one day of work a month.  *Id.*  She found that Madsen could perform in a task-oriented setting where contact with co-workers is only casual and infrequent, and where supervisors provide simple instructions for non-detailed tasks with no more than four supervisor contacts per day; but could not perform in a setting with any contact with the general public.  *Id.* Dr. Donovan listed the following objective signs and symptoms displayed by Madsen upon which she based her opinion: hypervigilance, flashbacks, avoidance, nightmares, and negative emotions.  *Id.*  She further noted that Madsen has difficulty with attention, memory, and social interaction.  *Id.*

The ALJ found that Dr. Donovan's opinion was inconsistent with the record as a whole, particularly her own treatment records.  (Tr. 40.)  The ALJ explained that Dr. Donovan's notes

routinely document an appropriate mood and affect, with no significant deficits or abnormalities in concentration, persistence, pace, thought process, thought content, memory, insight, judgment, or cognition.   (Tr. 40.)   He also pointed out that Dr. Donovan's opinion was inconsistent with Madsen's daily activities, as discussed above.   *Id.*

Finally, the ALJ discussed the Psychiatric Review Technique and Mental Residual Functional Capacity Assessment completed by state agency psychologist Steven Akeson, Psy.D on August 24, 2018.   (Tr. 40, 97-101.)   Dr. Akeson expressed the opinion that Madsen has moderate limitations in his ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage himself.   *Id.*   He found that Madsen retains the ability to understand and remember simple instructions, carry out simple work instruction, maintain adequate attendance and sustain an ordinary routine without special supervision, adapt to most usual changes common to a competitive work setting; and interact adequately with peers and supervisors, but would do best in a setting with limited interpersonal demands.   *Id.*

The ALJ found Dr. Akeson's opinions "persuasive" because he is a medical expert in the relevant field who reviewed the record, and his opinions are consistent with the record as a whole.   (Tr. 41.)   The ALJ specifically pointed to the mostly normal mental status examination findings of normal mood, affect, thought process, speech, and cognition.   *Id.*   He also cited the following factors: the record does not document frequent or long-term psychiatric hospitalization; Madsen did not receive frequent psychiatric treatment; the medical evidence does not note significant abnormalities on examination despite treatment; and treating providers did not indicate Madsen had any significant functional limitations.   *Id.*

Madsen argues that the ALJ erred in relying on the opinion of Dr. Akeson, because he did not examine Madsen.

For claims like Madsen's, filed on or after March 27, 2017, an ALJ evaluates medical opinions pursuant to 20 C.F.R. § 404.1520c.   These new rules provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [Plaintiff's] medical sources."   20 C.F.R. § 404.1520c(a).   Rather, an ALJ is to consider the persuasiveness of any opinion or prior administrative medical finding using the same five factors: (1) supportability of the opinion with relevant objective medical evidence and supporting explanations; (2) consistency with the evidence from other medical sources and nonmedical sources in the claim; (3) relationship with the plaintiff, including length, purpose, and extent of treatment relationship, whether it is an examining source, and frequency of examination; (4) specialization; and (5) other relevant factors. 20 C.F.R. § 404.1520c(c).   However, the rules make clear that supportability and consistency are the "most important factors," and therefore, an ALJ must explain how he considered these factors in the decision.   20 C.F.R. § 404.1520c(b)(2). An ALJ may, but is not required to, explain how he considered the remaining factors.   *Id.* *See Brian O v. Comm'r of Soc. Sec.*, No. 1:19-CV-983-ATB, 2020 WL 3077009, at *4 (N.D.N.Y. June 10, 2020) (quoting 20 C.F.R. § 404.1520c(a), (b)) ("Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how he or she considered the medical opinions' and 'how persuasive he or she finds all of the medical opinions.'"   (alterations omitted)).

Here, the ALJ properly considered the medical opinions, including that of Dr. Akeson, in compliance with the new regulations.   (Tr. 28-29.)   The new regulations require the ALJ to consider the opinions of state agency medical consultants because they are highly qualified and experts in Social Security disability evaluation.   *See* 20 C.F.R. § 404.1513a.   The ALJ found that Dr. Akeson's opinion was persuasive, as it was consistent with the medical evidence.   This finding is supported by the treatment notes summarized above.

The undersigned finds that the ALJ's RFC determination is supported by substantial evidence in the record as a whole.   In his discretion, the ALJ made an RFC finding that did not precisely reflect any of the medical opinions of record.   *See Martise*, 641 F.3d at 927 (ALJ is not required to rely entirely on one particular physician's opinion or choose between opinions).   The RFC is consistent with the opinion of the state agency physician.   As discussed above, the ALJ properly evaluated Madsen's subjective complaints of pain and limitations and found they were not entirely supported by the record.   The ALJ discussed the medical record and found that Madsen received only sporadic treatment for his mental impairments, few abnormalities were noted on examination, and his psychotropic medications were effective in decreasing his symptoms.   He also noted that Madsen was capable of living alone, attending regular church group meetings, going grocery shopping, and working for his mother.   The ALJ nonetheless credited Madsen's allegations of limitations resulting from anxiety and PTSD in imposing a significantly restricted mental RFC.

Madsen points to other evidence in the record that is supportive of his application for benefits, but he has failed to demonstrate that the ALJ's decision was outside the available "zone of choice."

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

/s/ *Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 2nd day of March, 2022.